

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. WR-13,374-05

---

**EX PARTE BOBBY JAMES MOORE, Applicant**

---

## ON APPLICATION FOR WRIT OF HABEAS CORPUS IN CAUSE
## NO. 314483-C IN THE 185TH JUDICIAL DISTRICT COURT
## HARRIS COUNTY

---

**ALCALA, J., filed a dissenting opinion.**

## DISSENTING OPINION

As recommended by the habeas judge, it is time for Texas to reevaluate the decade-old, judicially created standard in *Ex parte Briseno* in light of a shift in the consensus of the medical community regarding what constitutes intellectual disability, and in light of the Supreme Court's recent holding in *Hall v. Florida* indicating that courts are required to consider that consensus in assessing intellectual-disability claims.[1] *See Ex parte Briseno,* 135 S.W.3d 1, 6 (Tex. Crim. App. 2004); *Hall v. Florida*, __U.S.__, 134 S. Ct. 1986, 188 L. Ed. 2d 1007 (2014) . In the absence of any legislative guidance, this Court created the *Briseno*

---

[1]Whereas older case law uses the term "mental retardation," newer statutes and cases use the term "intellectual disability." I employ the latter term whenever possible.

standard as a temporary solution to the problem of defining "that level and degree of [intellectual disability] at which a consensus of Texas citizens would agree that a person should be exempted from the death penalty."[2] *Briseno*, 135 S.W.3d at 6. The standard was created in response to the Supreme Court's two-part holding in *Atkins v. Virginia* that (1) the Eighth Amendment of the federal Constitution prohibits the execution of a person with an intellectual disability as cruel and unusual punishment, and (2) each state must devise its own substantive and procedural mechanisms for determining which offenders are so intellectually disabled that there is a national consensus that it would be cruel and unusual to execute them. *Atkins v. Virginia*, 536 U.S. 304, 306, 321, 122 S. Ct. 2242 (2002). In response to *Atkins*'s first holding, the *Briseno* Court applied the same three-pronged general standard that had been employed by the Supreme Court to define intellectual disability. *Briseno*, 135 S.W.3d at 8. The standard was based on the American Association on Mental Retardation (AAMR) criteria,[3] and it required an applicant to demonstrate evidence of (1) significantly subaverage

---

[2]Merely lamenting the Texas Legislature's failure to act in the decade since *Atkins* was decided abdicates this Court's responsibility to ensure that federal constitutional rights are fully protected in Texas. *See Atkins v. Virginia*, 536 U.S. 304, 306, 321, 122 S. Ct. 2242 (2002). This Court cannot continue to apply an outdated and erroneous standard in the wishful hope that the Legislature will act soon, particularly in light of the fact that the legislative session just ended several months ago, and the Legislature does not meet again for approximately two years. Although it would obviously be preferable for the Legislature to set forth the policy with respect to who should be exempted from the death penalty on the basis of intellectual disability, this Court is required to uphold the federal Constitution as it has been interpreted by the Supreme Court. Doing what we have always done simply because the Legislature has not told us to do it otherwise is not the right answer.

[3]*See* American Ass'n on Mental Retardation, *Mental Retardation: Definition, Classification & Systems of Supports* (9th ed. 1992). This definition is substantively the same as the one in Texas Health and Safety Code Section 591.003(13), and *Briseno* held that these definitions were

general intellectual functioning, (2) related limitations in adaptive functioning, and (3) onset of the two preceding prongs prior to the age of eighteen. *Id* at 7. In response to *Atkins*'s second holding requiring each state to develop its own mechanisms for determining which offenders should be exempt from the death penalty on the basis of their intellectual disability, the *Briseno* Court initially "decline[d] to answer that normative question without significantly greater assistance from the citizenry acting through its Legislature,"[4] but it then went on to discuss a standard comprising seven evidentiary considerations, which, in practice, has been applied to determine whether an applicant's intellectual disability rises to the "level and degree" that a consensus of Texas citizens would agree that the death penalty would constitute cruel and unusual punishment. *Id*. at 6, 8-9. Thus, rather than separately consider the two steps by keeping the medical considerations apart from the legal ones, *Briseno* instead has been interpreted as conflating the two steps into a single analysis. By placing the legal standard's seven evidentiary considerations into the adaptive-deficits

---

appropriate as the general standard for deciding intellectual-disability claims in capital-murder cases. *Ex parte Briseno*, 135 S.W.3d 1, 8 (Tex. Crim. App. 2004). Because the *Briseno* Court indicated that the definition in the Health and Safety Code was interchangeable with the definition used by the American Association on Mental Retardation, I refer only to the AAMR definition, even though the analysis would also substantively apply to the definition in the Health and Safety Code.

[4]*See Briseno*, 135 S.W.3d at 6; *see also id.* at 8 ("Some might question whether the same definition of mental retardation that is used for providing psychological assistance, social services, and financial aid is appropriate for use in criminal trials to decide whether execution of a particular person would be constitutionally excessive punishment. However, that definitional question is not before us in this case because applicant, the State, and the trial court all used the AAMR definition. Until the Legislature provides an alternate statutory definition of mental retardation for use in capital sentencing, we will follow the AAMR or Section 591.003(13) criteria in addressing *Atkins* mental retardation claims.").

analysis in the medical standard, as this Court's majority opinion does today, the *Briseno* Court created a novel test for assessing claims of intellectual disability that has been widely criticized as applying an unscientific standard.[5] More importantly, *Briseno* conflicts with the Supreme Court's rationale in *Hall* in that its test for determining intellectual disability is not grounded in the current consensus of the medical community. There is no authority, medical or legal, that supports this kind of hybrid assessment of intellectual disability. This Court should take this opportunity to modify the *Briseno* test to require a bifurcated inquiry.

First, a court should determine whether a defendant is intellectually disabled based on

---

[5]*See*, *e.g.*, Nancy Haydt, Stephen Greenspan, & Bhushan Agharkar, *Advantages of DSM-5 in the Diagnosis of Intellectual Disability: Reduced Reliance on IQ Ceilings in Atkins (Death Penalty) Cases*, 82 U. MISS-KANSAS CITY L. REV. 359, 384 (2014) (observing that *Briseno* set forth a "list, for which no scientific justification was given" of "vaguely specified seven behaviors . . . which the court believed could be used to rule out a diagnosis of ID"); John H. Blume, Sheri Lynn Johnson, Paul Marcus, & Emily Paavola, *A Tale of Two (and Possibly Three) Atkins: Intellectual Disability and Capital Punishment Twelve Years after the Supreme Court's Creation of a Categorical Bar*, 23 WM. & MARY RTS. J. 393, 399 (2014) (Texas's *Briseno* factors make it "extraordinarily difficult to prove deficits in adaptive functioning"); Kate Janse Van Rensburg, *The DSM-5 and Its Potential Effects on* Atkins v. Virginia, 3 U. MEMPHIS SCHOOL OF L. MENTAL HEALTH L. & POL'Y J. 61, 79 (2013) ("Texas' definition has not been successful in achieving any of *Atkins*' aims but has been successful in severely limiting the number of defendants who were actually found to be intellectually disabled."); John H. Blume et al., *Of Atkins and Men: Deviations from Clinical Definitions of Mental Retardation in Death Penalty Cases*, 18 CORNELL J.L. & PUB. POL'Y 689, 710 (2009) ("The *Briseno* factors present an array of divergences from the clinical definitions."); James W. Ellis, *Symposium, Atkins v. Virginia: A Dozen Years Later—A Report Card: Hall v. Florida: The Supreme Court's Guidance in Implementing Atkins,* 23 WM. & MARY BILL RTS. J. 383, 383-84 (2014) ("The Supreme Court's emphasis on scientific and clinical understanding of intellectual disability calls into question the approach by a few courts that rest heavily on stereotypes about people with intellectual disability rather than on the scientific knowledge and experience accumulated by professionals in the field.").

the current standards employed by the medical community in the manual of the American Association on Intellectual and Developmental Disabilities (AAIDD, formerly known as the AAMR). Because this Court's majority opinion continues to apply the former medical standard that was in effect in 2004, rather than the prevailing views held by the medical community today, I would modify this portion of *Briseno* to reflect the current standards. In applying the current scientific standards to this case, I would hold that an IQ score is not definitive evidence of a lack of intellectual disability in a case such as this, where the majority of numerous IQ tests spanning decades have consistently indicated that applicant is in the range of an intellectually disabled person, and the habeas court found that evidence credible by determining that applicant has proven the first prong of his *Atkins* claim. Furthermore, in determining whether a defendant is intellectually disabled, I would hold that it is improper to commingle the seven evidentiary considerations that comprise the legal standard described in *Briseno* with the analysis of adaptive deficits pertinent to the medical community's standard, and I would clarify that the legal and medical inquiries are separate and should be subject to distinct analyses.

Assuming that the evidence shows that a defendant is intellectually disabled according to the current medical standards, then a court would progress to the second step that requires a determination of whether the extent of his intellectual disability is such that, as a matter of federal constitutional law, his execution for capital murder would constitute cruel and unusual punishment in violation of the Eighth Amendment. It is only at this second step that

a court should consider the type of evidence that is focused on the comparison and weighing of positive skills against deficits, similar to the seven evidentiary considerations in *Briseno*, so as to determine whether there would be a national consensus that a person at that level and degree of disability should not be subject to the death penalty. Furthermore, with respect to the second step, I would reformulate the seven evidentiary considerations described in *Briseno* so that they more closely track the types of considerations that persuaded the Supreme Court to decide that the execution of an intellectually disabled person would violate the Eighth Amendment.

In sum, I disagree with the majority opinion's conclusions that this Court properly "continue[s] to follow the AAMR's 1992 definition of intellectual disability" and that the *Briseno* standard "remains adequately 'informed by the medical community's diagnostic framework.'"[6] Because the decade-old *Briseno* standard was never intended to be permanent, it has become necessary to examine whether its continued application remains consistent both with the views currently held by the scientific community and with the societal consensus as to those offenders who, by virtue of their intellectual disability, should be exempted from the death penalty. *See Briseno*, 135 S.W.3d at 5 ("[W]e must act during this legislative interregnum to provide the bench and bar with temporary judicial guidelines in addressing *Atkins* claims."). After reformulating the standard, I would remand this case for the habeas court to consider whether, under the revised standard, it recommends granting relief to Bobby

---

[6]*See* maj. op., at 5-6 (quoting *Hall v. Florida*, 134 S. Ct. 1986, 2000 (2014)).

James Moore, applicant.  I, therefore, respectfully dissent.

## I.  Step One: A Court Must Decide Whether a Defendant Has an Intellectual Disability By Applying Current Scientific Standards

In light of both *Atkins* and *Hall*, a court reviewing an intellectual-disability claim is compelled to consult current medical standards in determining whether a particular offender falls within the medical definition of an intellectually disabled person.  Although this Court is applying (A) the Supreme Court's same three prongs that make up the general standard for deciding whether a person has an intellectual disability, this Court's majority opinion is flawed in its substantive assessment of the first two prongs because, in contravention of current medical standards, (B) it improperly applies a strict cutoff based on IQ scores, and (C) it erroneously applies unscientific criteria to assess whether a defendant has adaptive deficits.

### A.  The Supreme Court Requires a Court to Consider Current Medical Standards in Evaluating Whether the Evidence Establishes the Three-Pronged General Standard for Intellectual Disability

Although it set forth a general standard, the Supreme Court in *Atkins* left it to the states to devise a precise test for determining which offenders are so intellectually disabled that there is a national consensus that it would be cruel and unusual to execute them.  *Atkins*, 536 U.S. at 317 (explaining that prohibition on executing intellectually disabled individuals extends to those "mentally retarded offenders about whom there is a national consensus," but leaving to the states "'the task of developing appropriate ways to enforce the constitutional restriction'") (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 416 (1986)).  But the Court

in *Atkins* did not permit States to have complete autonomy in making this determination. *See*

*Hall*, 134 S. Ct. at 1999 ("*Atkins* did not give the states unfettered discretion to define the full

scope of the constitutional protection"; "[i]f the States were to have complete autonomy to

define intellectual disability as they wished, the Court's decision in *Atkins* could become a

nullity"). In *Hall*, the Supreme Court characterized its *Atkins* decision as providing

"substantial guidance on the definition of intellectual disability." *Id.* (citing *Atkins*, 536 U.S.

at 318). The *Atkins* Court observed that "clinical definitions of mental retardation require

not only subaverage intellectual functioning, but also significant limitations in adaptive skills

such as communication, self-care, and self-direction that became manifest before age 18."

*Atkins*, 536 U.S. at 318. Recognizing that there is a wide range of individuals who might be

characterized as intellectually disabled, and recognizing that not all such individuals would

be constitutionally exempted from the death penalty, the Supreme Court described the group

of people whose executions would violate the federal Constitution as those who, "[b]ecause

of their impairments, [ ] by definition [ ] have diminished capacities to understand and

process information, to communicate, to abstract from mistakes and learn from experience,

to engage in logical reasoning, to control impulses, and to understand the reactions of

others." *Id.* Further describing the class of intellectually disabled people who are exempt

from the death penalty, the Court also noted that "there is abundant evidence that [such

individuals] often act on impulse rather than pursuant to a premeditated plan, and that in

group settings they are followers rather than leaders." *Id*. In providing these descriptions,

the *Atkins* Court acknowledged the standards set forth in the manual of the American Association on Mental Retardation and the Diagnostic and Statistical Manual of Mental Disorders-IV (DSM-IV).[7] *Id*. at 308 n. 3.

More than a decade after the *Atkins* decision, the Supreme Court reaffirmed the general standard for determining intellectual disability in *Hall*. *See Hall*, 134 S. Ct. at 1994 ("As the Court noted in *Atkins*, the medical community defined intellectual disability according to three criteria: significantly subaverage intellectual functioning, deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing circumstances), and onset of these deficits during the developmental period."). Addressing the first prong in the general standard, the *Hall* Court held that, because the medical community's diagnostic framework does not quantify intellectual disability at an IQ score of seventy or below, it would violate the federal Constitution to limit the protections of the Eighth Amendment only to those offenders whose test scores are at or below that precise level. *Id.* at 1998. In reaching that holding, the Court considered and was persuaded by the medical community's current diagnostic framework. *Id*. at 1993, 2000 (stating that the "legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework," and further observing that "it is proper to consult the medical community's opinion").

---

[7]*See* American Ass'n on Mental Retardation*, Mental Retardation: Definition, Classification & Systems of Supports* (9th ed. 1992); American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 2000).

Viewed in conjunction, *Atkins* and *Hall* reveal that, for over a decade, the Supreme Court has applied the same three-prong general standard for analyzing intellectual-disability claims. Furthermore, *Hall* in particular signals that, even if a state is applying this same general standard, as did Florida in *Hall*, the federal Constitution may nonetheless be violated based on the particular analytical measures by which the state determines each of the three prongs. Even though the purpose of Florida's statute was to provide a legal standard that would permit anyone with an IQ level above 70 to be subject to the death penalty, the Supreme Court held that Florida's standard was constitutionally invalid because it was "in direct opposition to" the current medical standard for diagnosing intellectual disability, which does not provide for a cutoff in that manner. *See id.* at 2001. Having permitted each state to create its own test for deciding which people with intellectual disability would be exempt from the death penalty, the Supreme Court nonetheless held that, in the implementation of that policy decision, Florida had no discretion to misapply the current standards of the medical community for assessing intellectual disability. *See id.*

The present case presents a situation analogous to that in *Hall* in that, in the implementation of a policy decision describing who should be constitutionally exempted from the death penalty, Texas has no discretion to misapply the standard of the current medical community for assessing intellectual disability. *See id.* at 1999-2001. I would hold that this Court must consult the medical community's current views and standards in determining whether a defendant is intellectually disabled and that the reliance on a decade-

old standard no longer employed by the medical community is constitutionally unacceptable.

To this end, I would modify this Court's analysis in *Briseno* so that it conforms to the current consensus of the medical community. Like the Supreme Court in *Atkins*, *Briseno*'s analysis of intellectual disability was premised on the definition in the AAMR's ninth edition, but since the time that *Atkins* and *Briseno* were decided, the AAMR has been renamed to the AAIDD, and it is now in its eleventh edition.[8] Rather than rely on the older editions, the Supreme Court discussed the AAIDD's eleventh edition in *Hall*. *See Hall*, 134 S. Ct. at 1995. Similarly, like the Supreme Court in *Atkins*, *Briseno*'s analysis of intellectual disability considered the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV), but since the *Atkins* and *Briseno* decisions, that manual has been superseded by the Fifth Edition, the DSM-5.[9] Rather than rely exclusively on the older scientific standards as this Court does today by continuing to apply an unmodified *Briseno* standard, this Court, like the Supreme Court in *Hall*, should, at a minimum, consider how the developments in the scientific standards during the past ten years might affect a judicial determination of intellectual disability.[10] *See Hall*, 134 S. Ct.

---

[8]AAIDD, *Intellectual Disability: Definition, Classification, and Systems of Supports* (11th ed. 2010).

[9]American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013).

[10] The substance of Section 591.003(13) remains as it was when *Briseno* was decided, although some of the terminology has changed, such as the term "mental retardation," which is now called "intellectual disability." *See* TEX. HEALTH & SAFETY CODE § 591.003(13), (7-a) ("'Intellectual Disability' means significant subaverage general intellectual functioning that is

at 2000 (explaining that, as compared to the DSM-IV, the DSM-5 places less emphasis on a person's IQ score than on the person's adaptive deficits). Because the medical community's views on the assessment of intellectual disability have changed in the last decade, the Supreme Court in *Hall* considered the current consensus of the scientific community in deciding the merits of that case. This Court should follow suit. As I explain below, the DSM-5 has several important differences from the DSM-IV with respect to the proof of intellectual disability, and these differences require this Court to modify the *Briseno* standard.

### (B) Prong One: A Strict Cutoff Based on IQ Scores is Contrary to Current Medical Standards

This Court's majority opinion is contrary to the *Hall* Court's holding that an intellectual-disability claim should not be rejected by treating an IQ score as a precise number because the medical community does not quantify intellectual disability at an IQ score of seventy or below, nor does it treat an IQ score in the marginal range as being dispositive of an intellectual-disability diagnosis. *Hall*, 134 S. Ct. at 1998-2001. In

concurrent with deficits in adaptive behavior and originates during the developmental period."); § 591.003(1) ("'Adaptive behavior' means the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group."); § 591.003(20) ("'Subaverage general intellectual functioning' refers to measured intelligence on standardized psychometric instruments of two or more standard deviations below the age-group mean for the tests used."). The changes to the terminology were enacted by House Bill 1481 in 2011 in order to make the language referring to intellectual disabilities more respectful, but that legislation did not alter the substance of the definitions. *See* Tex. H.B. 1481, 82nd Leg., R.S. (2011).

explaining its finding that applicant had significant limitations in intellectual functioning, the habeas court made finding of fact number 78, in which it noted that IQ tests are not able or even designed to produce a single and precise figure, but rather are best conceptualized as a range of scores. The habeas court's finding that IQ test results should be treated as a range rather than as a precise number is consistent with the *Hall* Court's holding, and, therefore, this finding should be upheld by this Court. *See id.*

Whereas the Court in *Atkins* had considered the views of the medical community in the then-current DSM-IV, the Court in *Hall* considered the current DSM-5 in deciding that Florida's strict IQ cutoff was unconstitutional. *Compare Atkins*, 536 U.S. at 308 n. 3 (discussing DSM-IV), *with Hall*, 134 S. Ct. at 2000 (relying on the DSM-5 and quoting it for the proposition that "'IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks'"). Furthermore, as support for its conclusion that it was "not sound to view a single factor as dispositive of a conjunctive and interrelated assessment" of intellectual disability, and citing to the DSM-5, the Supreme Court observed that "a person with an IQ score above 70 may have such severe adaptive behavior problems . . . that the person's actual functioning is comparable to that of individuals with a lower IQ score." *Hall*, 134 S. Ct. at 1995, 2001. By applying a standard error of measurement but then using a strict cutoff based on IQ scores, this Court's majority opinion is effectuating the same type of standard that the Supreme Court rejected in *Hall* as constitutionally unacceptable.

Although analysis of IQ has not been completely removed from the diagnostic determination of intellectual disability in the DSM-5, its importance has been greatly reduced as compared to the DSM-IV. *See id.* Under the DSM-5, it is possible for a person with an IQ test result higher than 75 to be characterized as intellectually disabled depending on his adaptive functioning, as compared to the DSM-IV, which specifies that the 75 score would be dispositive within the margin of error. *Id.* Here, according to this Court's majority opinion, taking into account the standard error of measurement and ignoring the Flynn effect, the two tests it finds acceptable produced an IQ score range from 69-83, and this, therefore, would constitute an adequate basis for rejecting applicant's claim.[11] For the limited purposes of this discussion, I will accept the majority opinion's conclusion that the only two valid scores are applicant's 1973 WISC score and his 1989 WAIS-R score, which are higher than the other six scores. According to the DSM-5, applicant's IQ score alone should not be enough to reject his claim because it is necessary to also consider his adaptive functioning in conjunction with his IQ score. Given the reasoning of *Hall*, which requires a court to at least consult current medical standards in reaching a determination of intellectual disability, I disagree with this Court's majority opinion as to prong one of its intellectual-disability

---

[11]*See* maj. op., at 71 ("taking into account the standard error of measurement, applicant's score range on the WISC is between 73 and 83"; taken altogether, there is "no reason to think that applicant's obtained IQ score of 78 on the WISC is inaccurate or does not fairly represent his borderline intelligence during the developmental stage"); *see also id.* at 71-72 ("the score that applicant obtained on the 1989 WAIS-R supports the conclusion that his WISC score accurately and fairly represented his intellectual functioning during the developmental period"; his score range on the WAIS-R "is between 69 and 79").

analysis that holds that applicant's IQ scores ranging from 69-83, part of which fall below 70, are alone an independent reason for finding that he is not intellectually disabled.

I also disagree with this Court's majority opinion for the two additional reasons, as explained below, that (1) it cherry picks applicant's two higher IQ scores and (2) it disregards the other scores: the OLMAT (77), Slosson (57), WAIS-R (abbreviated) (71), 2013 RCPM (85), the WAIS-IV (59), and the derived scores on the Bender Gestalt (67) and Goodenough (72). First, I disagree with the majority opinion that it is proper to dismiss the WAIS-IV, the most recent and comprehensive test on which applicant scored a 59 in 2013, a score impliedly determined to be credible by the habeas court. The majority opinion's rationale for rejecting that test is that applicant put forth suboptimal effort because the State's expert, Compton, indicated that applicant had a motive to do poorly and gave suboptimal effort. The habeas court, however, impliedly found the evidence that applicant gave suboptimal effort not to be persuasive. The State's expert's testimony that applicant gave suboptimal effort was contradicted by a defense expert, Greenspan, who testified that it is difficult to interpret effort-test results as to intellectually-disabled individuals because of problems validating those tests, and such tests thus have reduced significance in this context. Furthermore, even accepting the majority opinion's analysis that the other scores are less reliable because they were based on noncomprehensive instruments, they were neuropsychological tests rather than IQ tests, and they used the now-disfavored concept of mental age to arrive at the score, these scores should not be disregarded in their entirety in

that they provide some evidence that supports the habeas court's findings that applicant had significant limitations in intellectual functioning. These other tests also provide evidence that supports the habeas court's findings that applicant did not give suboptimal effort in taking his most recent IQ test and that the State's expert's testimony on suboptimal effort lacked credibility. In short, even if the five other tests showing applicant as intellectually disabled do not stand alone as definitive evidence of intellectual disability, they, in conjunction, support the habeas court's fact finding that applicant's most recent IQ score is reflective of limitations in intellectual functioning. In the absence of the testimony from Dr. Compton, which was implicitly found not credible by the habeas court with respect to suboptimal effort, applicant's most recent IQ test places him easily within the range of IQ scores that show intellectual disability. And, although this Court is the ultimate fact finder, the credibility determinations regarding which expert was most believable should be left to the habeas court as the original fact finder in this case.

Second, even if the majority opinion is correct in disregarding the applicant's most recent IQ score, and even if it is correct that this Court should rely solely on the WISC administered at age 13 that produced a score of 78 and the WAIS-R at age 30 that produced a score of 74, these scores, under the current medical standards, would still require this Court to examine whether applicant has adaptive deficits.[12] Taking into account the standard error

[12]When the test took place, the administrator made a slight error that caused this test score to originally be recorded as 74. The error has since been acknowledged, so we need only concern ourselves with the correct score.

of measurement and ignoring the Flynn effect, these two tests produce a range from 69-83. A diagnosis of intellectual disability is often indicated by an IQ score of 70 or below, but, as the Supreme Court held in *Hall*, 70 is not a strict cutoff point beyond which the possibility of intellectual disability is foreclosed. *Hall*, 134 S. Ct. at 1996. Even disregarding most of the evidence that the habeas court found credible and relying only on applicant's two highest scores, the score range supports a finding that applicant has established the first prong.

Although I conclude that the record appears to support the habeas court's determination that applicant has significantly subaverage general intellectual functioning based on reliable IQ scores, I would not definitively decide that question today in order to permit the original fact finder to apply the correct modified standard to the evidence in this case.

### (C) Prong Two: Unscientific Criteria Should Not Be Used to Assess Adaptive Deficits

The *Briseno* analysis of the adaptive-deficits prong makes Texas's determination of intellectual disability unconstitutional because, as observed by the Supreme Court in *Atkins* and *Hall*, any such assessment should be informed by the current diagnostic standards employed by the medical community. More specifically, in light of the Supreme Court's analysis on this subject, the majority opinion's continued application of the *Briseno* standard is constitutionally unacceptable because it relies on an unscientific assessment that (1) considers adaptive deficits based on the DSM-IV alone, (2) includes a comparison to the

fictional character Lennie; and (3) considers seven evidentiary factors that are inapplicable in this context.

### 1. Adaptive Deficits Should Not Be Based on the DSM-IV Alone

The *Briseno* Court's decision to place a legal standard into the medical criteria for establishing adaptive deficits produced an unscientific standard that is inconsistent with the requirement that any standard be informed by current medical criteria. The DSM-5 altered the "adaptive functioning requirement" by describing it as how well a person meets community standards of personal independence and social responsibility in comparison to others of similar age and sociocultural background. *See* American Psychiatric Ass'n, *DSM-5 Intellectual Disability Fact Sheet* (2013); *see also* Shelly Yeatts, Texas District and County Attorneys Association, *Significant Changes from the DSM-IV to the DSM-5* (November 2013). The DSM-5 relies more on adaptive functioning than the DSM-IV did, both for diagnosing intellectual disability and for determining its level of severity. *Id*.; *see also* Walter Kaufmann, *Intellectual Disabilities's DSM-5 Debut*, SPECTRUM NEWS 2013. In terms of diagnosis, the DSM-5 assesses the level of adaptive functioning in three domains: social, conceptual, and practical skills,[13] and it requires at least one domain that includes several

---

[13] *See APA Intellectual Disability Fact Sheet*, at 1. The social skills domain considers the awareness of others' experiences, empathy, interpersonal communication skills, friendship abilities, social judgment, and self-regulation, among others. The conceptual domain considers language, reading, writing, math, reasoning, knowledge, and memory, among others, used to solve problems. The practical domain considers self management across life settings, including personal care, job responsibilities, money management, recreation, managing one's behavior, and organizing school and work tasks, among others.

skill areas of adaptive functioning versus two or more skill areas in the DSM-IV.  In short, the type of analysis for establishing adaptive functioning is different in the DSM-IV than in the DSM-5, and this Court should modify the *Briseno* test to conform to the current scientific standards. I, therefore, disagree with this Court's majority opinion as to prong two of its intellectual-disability analysis that rejects applicant's claim based on his failure to prove adaptive deficits under a standard that is no longer employed by the scientific community in assessing intellectual-disability claims.

Furthermore as to prong two, the DSM-5 appears to more readily acknowledge that people with intellectual disabilities are often able to perform basic life functions and tasks, such as holding jobs, driving cars, and supporting their families. *See Wiley v. Epps*, 625 F.3d 199, 203, 204 (5th Cir. 2010).  People with intellectual disabilities may be able to (1) read, write, and perform some rudimentary math; (2) have friends; (3) maintain personal hygiene; (4) drive a car on occasion; (5) appropriately groom themselves and possess a driver's license; and (6) maintain a relationship.[14]  None of these skills or abilities are necessarily inconsistent with intellectual disability.  This Court's majority opinion, however, gives heavy weight to applicant's ability to perform some of the functions listed above even though the current scientific community would discount that type of behavior as dispositive evidence of adaptive functioning.  I disagree with this Court's majority opinion as to prong two of its

---

[14]*See* John H. Blume, Sheri Lynn Johnson, Paul Marcus, & Emily Paavola, *A Tale of Two (and Possibly Three) Atkins: Intellectual Disability and Capital Punishment Twelve Years after the Supreme Court's Creation of a Categorical Bar*, 23 WM. & MARY RTS. J. 393, 408 (2014).

intellectual disability analysis that rejects applicant's claim based on his failure to prove adaptive deficits by giving great weight to evidence that is no longer credited by the scientific community in assessing intellectual disability claims.

Additionally as to proof of adaptive functioning or adaptive deficits, unlike the DSM-IV that permitted evidence about a defendant's behavior in prison, the DSM-V recommends that this assessment be determined outside of a prison setting. *Wiley*, 625 F.3d at 203, 204. The DSM-5 recognizes that people on death row operate within a world where choices are extremely limited, even for such basic matters as when to wake up and when to go to bed, what to eat, when to shower or change clothes, and other life basics. The DSM-5, therefore, discounts much of the evidence about a defendant's ability to function inside a prison setting. This Court's majority opinion, however, gives heavy weight to applicant's ability to function and work while on death row even though the current scientific standards in the DSM-5 would discount that type of behavior as evidence of adaptive functioning, because ordinarily the kinds of tasks that are assigned can be performed by someone who is intellectually disabled.

But, perhaps, not all evidence obtained during a defendant's prison stay is immaterial to the question of his adaptive deficits or functioning. Any decision to consider a defendant's prison behavior must be examined closely for details that might show learned behavior from the great repetition of an event or limited choices. For example, here, this Court's majority opinion considers applicant's use of commissary slips in prison to suggest that he does not

have adaptive deficits because he could understand the math involved to manage his commissary. The majority opinion relies on the testimony of Jerry LeBlanc, a prison official who testified that applicant appeared to understand his commissary order and that applicant did not receive any assistance from LeBlanc. But it is apparent that the habeas court was unpersuaded that LeBlanc's testimony demonstrated applicant's lack of adaptive deficits. In finding of fact number 169, the habeas court found that applicant had significant difficulty in filling out his commissary slips and in negotiating the $85 spending limit. The habeas court further mentioned that its examination of the commissary records revealed "numerous mathematical and spelling errors" on the slips as well as commissary requests adding up to significantly more than the spending limit on fifteen out of twenty-four slips in evidence. The habeas court found that the repeated mathematical errors and consistent excessive ordering combined with the simple, unchanging spending limit reflected a lack of understanding of these basic concepts. I disagree with this Court's majority opinion's analysis as to prong two that rejects applicant's claim based on his purported failure to prove adaptive deficits by considering his general ability to function on death row when much of that type of evidence is no longer considered probative by the scientific community in assessing intellectual disability claims due to the repetitive nature of the events and limited choices, and, to the extent that certain jail-house evidence can be probative, the habeas court found that the State's evidence was lacking in credibility and unpersuasive.

I also note that the majority opinion decides that applicant does not have adaptive

deficits, in part, by considering *pro se* documents that he presented for his writ application. However, applicant's counsel presented evidence that applicant may have had help in preparing those documents. Again, the habeas court appears to have credited the applicant's evidence more than the State's evidence. Ordinarily, this Court, as the ultimate fact finder, defers to the habeas court, the original fact finder, on matters involving credibility of the evidence.

The majority opinion makes many observations that conflict with the habeas court's assessment of adaptive deficits, but it does so by applying the *Briseno* test that I conclude does not comply with the Supreme Court's requirements in *Hall*. Although I disagree with some of the majority opinion's analysis with respect to the lack of evidence of adaptive deficits, I would not decide this question here but would instead remand for the habeas court to reconsider the evidence under a new modified test that considers current medical standards, and, as explained below, omits the Lennie standard and the seven evidentiary considerations.

### 2. The Second Prong on Adaptive Deficits Should Not Include a Comparison to Fictional Character

Even if the literary reference to Lennie was simply an attempt to write colorfully gone awry, its inclusion in *Briseno* suggests that people who are severely or profoundly intellectually disabled would not be subject to the death penalty; that people who are mildly intellectually disabled would be subject to the death penalty; and that people who are

moderately intellectually disabled may, depending on the circumstances, be subject to the death penalty. *See Briseno,* 135 S.W.3d at 6. The *Briseno* Court discussed the then-existing DSM-IV four subcategories for mental retardation: "mildly mentally retarded, moderately mentally retarded, severely mentally retarded, and profoundly mentally retarded." *Id*. This Court then stated,

> The functioning level of those who are mildly mentally retarded is likely to improve with supplemental social services and assistance. It is thus understandable that those in the mental health profession should define mental retardation broadly to provide an adequate safety net for those who are at the margin and might well become mentally-unimpaired citizens if given additional social services support. We, however, must define that level and degree of mental retardation at which a consensus of Texas citizens would agree that a person should be exempted from the death penalty. Most Texas citizens might agree that Steinbeck's Lennie should, by virtue of his lack of reasoning ability and adaptive skills, be exempt. But does a consensus of Texas citizens agree that all persons who might legitimately qualify for assistance under the social services definition of mental retardation be exempt from an otherwise constitutional penalty? . . . As a court dealing with individual cases and litigants, we decline to answer that normative question without significantly greater assistance from the citizenry acting through its Legislature.

*Id.* In referring to Lennie as someone who might be exempt from execution whereas others unlike him would not be, this Court's opinion has been read as implying or holding that those individuals who are less than severely or profoundly intellectually disabled would not be exempt from execution. Under that standard, Texas law creates a blanket rule that makes it constitutionally permissible to execute someone who the DSM-IV would catagorize as mildly

or moderately intellectually disabled. I conclude that, to the extent that the Texas standard categorically permits the execution of a mildly or moderately intellectually disabled person, even one whose intellectual disability is such that he has a "diminished capacit[y] to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others," then the Texas standard is unconstitutional. *See Atkins*, 536 U.S. at 318 (discussing the justification for holding that the federal Constitution prohibits the execution of intellectually disabled people). I would hold that the Lennie standard does not meet the requirements of the federal Constitution because it potentially permits the execution of a mildly or moderately intellectually disabled offender who meets the legal definition of *Atkins*, and it categorically limits the protections of the Eighth Amendment to those offenders determined to be severely or profoundly intellectually disabled. I conclude that any standard set forth by Texas must at least contemplate the possibility that someone categorized as mildly or moderately intellectually disabled in the DSM-IV might have the specific type of adaptive deficits to make him ineligible for execution according to the Supreme Court's reasoning in *Atkins*. Therefore, I would set forth a standard that does not include any reference to a fictional character as a basis of comparison for deciding whether a person is exempt from the death penalty by reason of his intellectual disability.

### 3. Adaptive Deficits Should Not Include the Seven *Briseno* Evidentiary Considerations

The *Briseno* Court mentions seven evidentiary considerations that could be considered

as part of an assessment of a defendant's adaptive deficits, but it did so without any supporting authority. This Court stated,

> [S]ome other evidentiary factors which factfinders . . . might also focus upon in weighing evidence as indicative of mental retardation:
>
> • Did those who knew the person best during the developmental stage — his family, friends, teachers, employers, authorities—think he was mentally retarded at the time, and, if so, act in accordance with that determination?
>
> • Has the person formulated plans and carried them through or is his conduct impulsive?
>
> • Does his conduct show leadership or does it show that he is led around by others?
>
> • Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?
>
> • Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?
>
> • Can the person hide facts or lie effectively in his own or others' interests?
>
> • Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Briseno*, 135 S.W.3d at 8.

These seven questions do not belong in any determination about a defendant's adaptive deficits. Although they have similarity to some of the inquiries about adaptive deficits, these seven questions have a different focus from a determination on adaptive deficits in that they weigh a defendant's positives against his negatives. The weighing of positives against negatives is unlike a scientific determination of adaptive deficits, which looks solely at a person's inability to perform certain functions. Because it improperly conflated the legal

standard with the medical standard in its decision permitting the injection of seven unscientific questions to evaluate adaptive deficits, the *Briseno* standard erroneously applies modern scientific principles. I, therefore, would hold that the seven questions have no application to a decision about adaptive deficits.[15]

Rather than conflate a legal policy standard with a medical standard, this Court should limit the first step in its analysis to a determination whether the medical community would consider an individual to be intellectually disabled. If a defendant fails to meet this test, then his claim likewise fails. But if a defendant can show that the medical community would consider him to be intellectually disabled, then the Court would progress to the second step.

## II. Step Two: Determination of the Legal Standard Whether There Is a National Consensus Against the Death Penalty For Someone at the Applicant's Level of Intellectual Disability

I do not suggest that the type of information in the seven *Briseno* evidentiary considerations must be entirely excluded from any analysis of intellectual disability, but instead I would confine those kinds of questions to a second step in an analysis that occurs only after finding that a defendant is, according to prevailing medical/scientific standards, intellectually disabled. Furthermore, I would modify the seven questions so that they would more closely reflect the underlying rationale for disallowing the execution of certain

---

[15] Because my primary disputes with the majority opinion are with respect to the first two prongs, and because I believe this case must be remanded for the habeas court to reconsider the evidence under a revised standard for deciding intellectual-disability claims, I do not, at this juncture, include an analysis of the third prong with respect to whether applicant has proven the onset of any intellectual disability prior to age eighteen.

intellectually disabled offenders.

The second, third, and fifth *Briseno* questions are appropriately founded on the Supreme Court's *Atkins* opinion. The second question asking about whether the defendant can formulate plans or exhibits impulsive conduct, the third question about whether he is a leader or a follower, and the fifth question about whether his communication is coherent or irrational all target the reasons why the Supreme Court determined that the federal Constitution prohibits the execution of intellectually disabled people. The *Atkins* Court identified those reasons, observing that "[b]ecause of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reaction of others." *See Atkins*, 536 U.S. at 318. The Court also noted that "there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders." *Id*. These three *Briseno* factors track the legal rationale underpinning *Atkins* and, I conclude, are appropriate considerations when deciding whether a person is legally exempt from the death penalty.

Turning to the remaining questions, the first and seventh factors may be appropriate if they are modified. The first question asks, "Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at the time, and, if so, act in accordance with that determination?" One

problem with this question is that it appears to invite individuals to give their subjective opinions comparing the defendant to a stereotype of how they believe an intellectually disabled person would appear or behave. Although I conclude that it is appropriate to consider evidence by a defendant's family, friends, teachers, employers, authorities, and anyone else who the defendant had contact with during his developmental period, I conclude that the more appropriate inquiry should focus on those individuals' observations about the kinds of deficits and behaviors that made the defendant unlike his peers, what those deficits were, and how they were addressed.[16]  *See Hall*, 134 S. Ct. at 1996 (factors that indicate whether the person "had deficits in adaptive functioning . . . include evidence of past performance, environment, and upbringing").  By targeting the evidence to specifically address observations of a defendant's adaptive deficits, the fact finder can decide whether the level and degree of those deficits amount to a conclusion of intellectual disability such that a defendant may not constitutionally be executed.  The first *Briseno* question, therefore, may

---

[16]In assessing adaptive functioning, clinicians focus on a variety of deficits. "AAIDD's classification manual emphasizes the actual impact of intellectual limitations on the individual's life: 'Adaptive behavior is the collection of conceptual, social, and practical skills that have been learned and are performed by people in their everyday lives.' Among the tools available to clinicians in diagnosing adaptive deficits are standardized psychometric instruments known as adaptive behavior scales. Unlike IQ tests, these instruments are not administered to the person who is being evaluated, but rather focus on other sources of information, including information provided by teachers, family members, and others familiar with the individual's everyday functioning. Along with school and social service records and similar evidence, these may permit an evaluator to determine whether the reduced cognitive functioning measured by IQ tests constitutes a real-world disability in the individual's life. Since adaptive behavior inquiries in the context of a capital trial are, of necessity, retrospective in nature, a thorough individual, educational, and family history becomes essential." James W. Ellis, *Symposium, Atkins v. Virginia: A Dozen Years Later–A Report Card: Hall v. Florida: The Supreme Court's Guidance in Implementing Atkins*, 23 WM. & MARY BILL RTS. J. 383, 388-89 (2014).

be appropriately considered if it is modified to target adaptive deficits.

The seventh *Briseno* question focuses on whether the defendant's offense required forethought, planning, and complex execution of purpose. That question could be of marginal relevance if the offense required those things but the defendant's particular role in the offense did not. A more appropriate question would align with the rationale underlying *Atkins* by asking whether the defendant's acts in the commission of the offense show that he had a diminished capacity to understand and process information, to communicate, to abstract from mistakes, to learn from experience, to engage in logical reasoning, to control impulses, to understand the reaction of others*,* and whether he was a follower rather than a leader (if the offense was committed by a group). *See Atkins*, 536 U.S. at 318. The seventh *Briseno* question, therefore, may be appropriately considered if it is modified to target the adaptive deficits of the defendant that may have been exhibited during the commission of the offense so as to permit a fact finder to determine whether the level and degree of his intellect warrants a legal exemption from the death penalty.

I also conclude that the remaining two questions are inappropriate and should be eliminated as irrelevant. These two questions focus on the rationality of an offender's response to external stimuli and on whether he can hide facts and lie effectively.[17] The

---

[17] "A feature of adaptive behavior that causes some confusion is that the focus is exclusively on deficits and not on strengths. At first blush, the exclusive focus on deficiencies may seem counterintuitive, but clinicians have long recognized that for almost all individuals with intellectual disability, functional weaknesses coexist with strengths, and there is no 'list' of things that no individual with intellectual disability can do. With the increased focus on adaptive deficits after

Supreme Court in *Atkins* did not specifically list either of these considerations as constituting reasons why executing the intellectually disabled is unconstitutional. *See Atkins*, 536 U.S. at 318. It is unclear how information about a defendant's response to external stimuli would assist anyone is deciding whether he is constitutionally ineligible for execution. Perhaps the question about a defendant's ability to lie effectively was intended to target his ability to understand and process information in that someone who can consistently maintain a lie without contradiction might have higher intellectual reasoning. But maintaining a lie seems to include a moral compass that is immaterial to whether someone has an intellectual deficit, and the other questions seem to better reveal whatever might be relevant from this question without its prejudicial component. I fail to see any sound reason why these two questions would be proper evidentiary considerations in determining whether a particular individual has demonstrated that he is ineligible for execution under the reasoning of *Atkins*.

Some of these seven considerations, and perhaps other evidence, should be considered as part of a second step that is addressed only after a court has determined that a defendant has proven the three prongs in the AAIDD. The second step of an Eighth Amendment intellectual-disability analysis should focus on whether a defendant who has proven that he

---

*Hall*, there is a substantial risk that triers of fact may fall into the trap of relying on unfounded and inaccurate stereotypes about what people with intellectual disability can and cannot do. Courts will need to be particularly careful not to rely, either directly or indirectly, on such stereotypes." James W. Ellis, *Symposium, Atkins v. Virginia: A Dozen Years Later–A Report Card: Hall v. Florida: The Supreme Court's Guidance in Implementing Atkins*, 23 WM. & MARY BILL RTS. J. 383, 388-89 (2014).

has an intellectual disability has also shown that, according to the reasoning of *Atkins*, the extent of his disability is such that it would constitute cruel and unusual punishment to execute him for capital murder. I would hold that only some of the seven *Briseno* factors may remain viable, and only to the extent that they provide information relevant to the legal determination whether the extent of a defendant's intellectual disability rises to the level that there is a national consensus against permitting him to be executed.

### III. Conclusion

Because the habeas court's findings of fact and conclusions of law were premised on an attempt to apply parts and distinguish other parts of the *Briseno* standard, I would set forth a new modified standard for deciding intellectual disability claims and remand this case to the habeas court. I limit this dissenting opinion to voicing my concerns with the continued application of the *Briseno* standard, which I believe does not conform to the requirements of the federal Constitution, and to set forth some possibilities for a modified standard. I do not attempt to formulate a precise standard to replace the now-outdated *Briseno* standard. Any new or revised standard ultimately should be made by the Legislature, but until then, in the absence of statutory guidance, a new standard should be developed by a majority of the judges on this Court, and taking into account the informed view of a consensus of the medical scientific community and the people of the State of Texas.

Filed: September 16, 2015

Publish